## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

```
_____
RICHARD WEINLEIN,              :
                              :        Civil Action No.
             Plaintiff,        :        12-4625 (NLH)
                              :
        v.                     :
                              :          OPINION
ANAPA SHIPPING LIMITED,        :
                              :
             Defendant.        :
_____
```

**Appearances:**

SCOTT ANDREW PORTNER
FREEDMAN & LORRY PC
1601 MARKET STREET
2ND FLOOR
PHILADELPHIA, PA 19103
*Attorney for Plaintiff*

DANIEL HAROLD WOOSTER
PALMER, BIEZUP & HENDERSON
330 MARKET STREET
CAMDEN, NJ 08102-1524
*Attorney for Defendant*

**HILLMAN, District Judge**

This action was brought by plaintiff, Richard Weinlein, as a result of personal injuries he sustained while in the course and scope of his employment as a longshoreman. Weinlein was injured while discharging cargo from the marine vessel (M/V) Anapa, a vessel owned and operated by defendant Anapa Shipping Limited ("ASL" or "defendant"). Plaintiff seeks damages for injuries to his left knee pursuant to Section 5(b) of the

Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §905(b) which permits a longshoreman to recover damages from a vessel, in the event of an injury that is caused by the negligence of a vessel.

Before the Court is defendant's motion for summary judgment.  For reasons explained below, defendant's motion will be granted.

## I.    <u>BACKGROUND</u>

Plaintiff was employed by Delaware River Stevedores, Inc., ("DRS") as a longshoreman.  Plaintiff has about 35 years of experience as a crane operator, operating a crane a third of the time.  On October 28, 2011, plaintiff was discharging a cargo of steel coils from the cargo holds of the M/V Anapa to the Pier at the Balzano Marine Terminal in Camden, New Jersey (formerly known as the Beckett Street Terminal).  The M/V Anapa is a bulk carrier owned by defendant and was delivered as a new ship to defendant on September 1, 2010, just over a year before the alleged accident.  The M/V Anapa was designed and constructed with four ship's cranes serving the five cargo holds located forward of the ship's house.  The cranes are numbered forward to aft as Crane Nos. 1 through 4.

DRS, an independent stevedoring company, was engaged to

discharge the vessel's cargo of steel coils.  When the M/V Anapa arrived in Camden, the steel coils were stowed in the vessel's five cargo holds, and the DRS stevedore crane operators, including plaintiff, utilized the ship's cranes to discharge the steel coils from the cargo holds to the pier.  Plaintiff was supervised by Gang Foreman Joe Schaffer, Ship Foreman Hankinson and Vessel Superintendent David Gabriel.  Gabriel boarded the vessel before the start of cargo operations on October 28, 2011, walked the decks of the vessel, reviewed the crane certificates, reviewed the stowage plan, and met with the ship boss to determine the DRS "gang hatch assignments" and which ship's cranes were going to be operated by the DRS crane operators.

A total of three gangs of DRS longshoremen were working aboard the M/V Anapa.  Plaintiff was one of two crane operators in the "Joe Schaffer Gang."  The two crane operators alternated work shifts on the same crane; specifically, plaintiff and fellow crane operator, Bryan Jones, alternated two and half hours on and two and half hours off in the morning, and four hours on and four hours off in the afternoon.

At approximately 1:15 p.m., plaintiff climbed up the ladder to the No. 2 crane housing.  Inside the No. 2 crane housing was a red fixed vertical ladder attached to the rotating turret and six sets of two gray rungs welded, one on top of the other, to

3

the cylindrical wall or interior bulkhead of the stationary
pedestal.  The gray rungs are attached to the wall as two fixed
steps and the six sets of two steps are roughly evenly spaced
around the circumference of the pedestal interior wall.  The
configuration inside the No. 2 crane housing is similar to the
arrangement plaintiff had encountered at the No. 3 crane
pedestal earlier in the day, as the interior ladder arrangements
for crane Nos. 1 through 4 aboard the M/V Anapa are virtually
identical.

     To get to the second level where the red ladder was
located, plaintiff had to go through a "manhole."  The red
ladder was positioned to the right of the manhole.  The distance
from the bottom rung of the ladder to the landing was
approximately two and half feet, and the distance from the
interior wall to the fixed ladder was approximately 21 inches.
The longest distance from any set of gray rungs to the ladder
was 9.45 inches.  Each crane was capable of rotating 360
degrees.  There were no written instructions posted regarding
operation of the ladder or how the ladder was supposed to be
aligned with the gray fixed steps.

      Plaintiff did not use the sets of gray rungs welded on the
cylindrical bulkhead of the stationary crane pedestal at the
time of the incident.  Rather, plaintiff stood alongside the

stationary ladder and put his right hand on the side of the
ladder, about equal to the level of the fifth rung, and his left
hand on one of the rungs above the bottom rung. At that time,
his two feet were on the deck of the second level.  As he was
standing to the side of the ladder, and not directly in front or
behind it, he bent his left knee and stretched it up to the
bottom rung (approximately two and half feet), so that he could
attempt to hoist his 230 pound body up the ladder.  At that
point, his left knee "kind of gave – like slid on the rung a
little bit" and he felt a "twang" in his left knee, "like a pop
thing".  After he felt the "twang," plaintiff continued up the
ladder to the crane cab and operated Crane No. 2 discharging
cargo until 5:00 p.m. when he was relieved by Jones.  At 5:00
p.m., plaintiff climbed down the red ladder.

Plaintiff reported his injury that day at approximately
4:00 p.m. by telephoning one of his DRS supervisors from the
crane cab.  Superintendent Gabriel investigated the accident and
prepared a "DRS Supervisor's Accident Investigation" Report
dated October 28, 2011, signed by plaintiff, which states
"[w]hile climbing up ladder in crane, there was a gap in between
steps[;] Rich had to raise his left leg in order to reach the
next step, in doing so he felt pain in his left knee."

After speaking with plaintiff, Gabriel went up into the No.

2 crane housing to look at the scene of the alleged incident. He put one foot on the bottom rung of the red ladder and then stepped back down to the landing. Gabriel was able to put one foot on a gray rung and one foot onto the bottom rung of the red ladder, but did not attempt to hoist his body completely onto the ladder. Sometime later, Gabriel went up into the No. 2 Crane a second time with DRS Supervisors Pat Krysczak and Michael Gilkis. During his investigation, Gabriel did not see anything broken or missing. Gabriel never brought plaintiff's accident to the attention of a ship's officer or crewmember, and never requested or demanded that ship's personnel take any sort of action. Although he reported plaintiff's accident up the chain of command to DRS Vice President Roger Youngren, no corrective action was put in place by the stevedore.

Plaintiff's co-worker, Bryan Jones, testified that he had a conversation with a ship's mate about the difficulty involved in climbing the crane. Jones asked the mate whether there were steps that could be taken to make it easier and safer to climb that ladder but the ship's mate did not discuss it with him and told Jones to "return to work".

After the accident and Gabriel's investigation, Stevedore DRS and its crane operators continued to use the ship cranes and discharge the cargo of steel from 5:00 p.m. to 9:00 p.m. on

October 28, 2011, from 7:00 a.m. to 6:00 p.m. on October 30, 2011, and from 7:00 a.m. to 4:30 p.m. on October 31, 2014.

Defendant argues that because plaintiff's alleged injury was the result of the design arrangement of the No. 2 crane ladder, there can be no evidence that defendant breached certain duties under the LHWCA.  Plaintiff argues that summary judgment is not proper because defendant failed to turn its vessel over to the longshoremen in a safe condition for unloading, and that defendant breached its duty to correct the hazardous condition of the ladder.

## II.  **JURISDICTION**

This Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity).  Plaintiff is a citizen of Pennsylvania and defendant is a corporation organized under the laws of Liberia, with its principal place of business in Monrovia, Liberia.[1]

## III. **STANDARD OF REVIEW**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to

---

1 Federal Courts have diversity jurisdiction over cases between citizens of the United States and citizens of foreign states. See Bayerische Landesbank, New York Branch v. Aladdin Capital Bayerische Landesbank, New York Branch v. Aladdin Capital Management LLC, 692 F.3d 42, 49 (2nd. Cir. 2012).

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.  Thus, to withstand a properly supported motion for summary

8

judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).[2]

**IV.  DISCUSSION**

**A. Duties Owed by Vessel under the LHWCA**

Plaintiff brings claims pursuant to §905(b) of the LHWCA. "A vessel may be liable to a longshore worker under the LHWCA when the vessel, whether acting jointly with a longshoreman or individually, breached a duty owed to the injured worker."[3]

---

[2] The parties are reminded that they are required to follow the Court's Local Rules, particularly Local Rule 7.2 which limits briefs to 40 pages using a 12-point non-proportional font, and 30 pages using a 12-point proportional font.  Rule 7.2(d) also requires that footnotes be in the same size of type as the text. In the future, the Court will not consider any pages over the limit without prior authorization, or minimized footnotes.

[3] The LHWCA was amended in 1972, including the addition of §905(b), which "radically changed" the scheme of things by increasing the stevedore's obligation to provide compensation payments to injured longshoremen and limiting the longshoreman's right to recover from the vessel owner.  Prinski v. Blue Star Line Marine Ltd., 341 F.Supp.2d 511, 516 (E.D.Pa. 2004) (citing Scindia, 451 U.S. at 165).  "The amended LHWCA increases the stevedore's obligation by establishing 'a comprehensive federal workers' compensation program that provides longshoremen and their families with medical, disability, and survivor benefits for work-related injuries and death.'"  Id. (citing Howlett v. Birkdale Shipping Co., 512 U.S. 92, 96, 114 S.Ct. 2057, 129

9

<u>Fiocca v. Triton Schiffahrts GmbH</u>, 530 F. App'x 183, 186 (3d Cir. 2013) (citing <u>Davis v. Portline Transportes Maritime Internacional</u>, 16 F.3d 532, 540 (3d Cir. 1994)).  "The Supreme Court has enumerated three general duties that vessel owners owe to longshoremen: (1) the turnover duty, (2) the active operations duty, and (3) the duty to intervene." <u>Id.</u> (citing <u>Scindia Steam Navigation Co., Ltd. v. De Los Santos</u>, 451 U.S. 156, 167, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981)).  Here, plaintiff is seeking damages under the turnover duty and the active operations duty.  He is not seeking damages under a theory of breach of the duty to intervene.

The turnover duty requires a vessel to "exercise ordinary care under the circumstances to turn over the ship and its equipment and appliances in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care to carry on cargo operations with reasonable safety to persons and property." <u>Howlett v. Birkdale Shipping Co., S.A.</u>, 512 U.S. 92, 98, 114 S.Ct. 2057 (1994) (citing <u>Federal Marine Terminals, Inc. v. Burnside Shipping Co.</u>, 394

L.Ed.2d 78 (1994) (citations omitted)).  Liability is now limited to negligence in Section 905(b).

10

U.S. 404, 416-417, n. 18, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969)
(internal quotation marks omitted)).  "A corollary to the
turnover duty requires the vessel to warn the stevedore of any
hazards on the ship or with respect to its equipment, so long as
the hazards are known to the vessel or should be known to it in
the exercise of reasonable care, and would likely be encountered
by the stevedore in the course of his cargo operations, are not
known by the stevedore, and would not be obvious to or
anticipated by him if reasonably competent in the performance of
his work."  Id.  (internal quotation marks and citations
omitted).  "Most turnover cases brought under § 5(b) concern the
condition of the ship itself or of equipment on the ship used in
stevedoring operations."  Id. (citations omitted).

The active operations duty requires a vessel owner to
exercise reasonable care to prevent injuries to longshoremen in
the areas of the ship over which the vessel remains in active
control after stevedoring operations have begun.  Fiocca 530
Fed.Appx. at 186 (citing Scindia, 451 U.S. at 167-68, 101 S.Ct.
1614).  To establish a prima facie case of breach of the
operations duty, a plaintiff must show: (1) that the vessel
appreciated, should have appreciated, or with the exercise of
reasonable care would have appreciated, the condition; (2) that
the vessel knew, or should have known, that the condition posed

an unreasonable risk of harm to a longshore worker; (3) that a longshore worker foreseeably might fail to (i) either discover the condition or apprehend the gravity and probability of the harm, or (ii) protect himself or herself from the danger; and (4) that the vessel failed to take reasonable precautionary or remedial steps to prevent or eliminate the dangerous condition." Serbin v. Bora Corp., Ltd., 96 F.3d 66, 71 (3d Cir. 1996) (citing Davis v. Portline Transportes Maritime Internacional, 16 F.3d 532, 541 (3d Cir. 1994)).

"As a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards." Scindia Steam Nav. Co., Ltd. v. De Los Santos, 451 U.S. 156, 170, 101 S.Ct. 1614 (1981). "[T]he stevedore, the longshoremen's employer, [should] provide a "reasonably safe" place to work and [] take such safeguards with respect to equipment and working conditions as the Secretary of Labor may determine to be necessary to avoid injury to longshoremen." Id.

**B. Unseaworthiness**

Defendant argues that it received delivery of the M/V Anapa on September 1, 2010 and the ship was practically brand new. The vessel was built and designed by a shipyard in China, and the four ship's cranes, including interior crane ladders, were

12

designed, constructed and manufactured by South China Marine
Machinery Co. Ltd. and installed at the shipyard.  ASL did not
design or construct the vessel or the ship's cranes.

Defendant states that plaintiff has not alleged or provided
evidence that the ladder was broken, improperly maintained, or
missing any parts.  Rather, defendant maintains that the
condition that plaintiff alleges caused his accident is the
manner in which the ladder arrangement was designed and
constructed, and that a negligent design theory of recovery is
barred as a matter of law.  Defendant argues that allegations of
a defect in the structural design of the vessel are nothing more
than allegations of unseaworthiness, for which LHWCA § 905(b)
provides no recovery.

The law is clear that a plaintiff cannot recover damages
from a vessel owner for unseaworthiness.  Scindia, 451 U.S. at
165 (After adoption of the 1972 Amendments, "the longshoreman's
right to recover for unseaworthiness was abolished").  Although
plaintiff attempts to color his claim as one sounding in
negligence (which cause of action is permitted against a vessel
owner), the crux of his claim is a design defect of the ladder.
A claim of improper design or design defect is essentially a
claim for unseaworthiness.  Bilderbeck v. World Wide Shipping
Agency, 776 F.2d 817, 819 (9th Cir. 1985) (finding that

13

allegations that ship and crane were negligently designed to be alternative way of saying that the vessel was unseaworthy, and affirming trial court's determination that allegations were attempt to get seaworthiness into the case in the face of clear Congressional intent to remove it.); Anastasiou v. M/T World Trust, 338 F.Supp.2d 406, 418 (E.D.N.Y. 2004) ("A claim for negligent design is merely another way of alleging that the Vessel was unseaworthy, a cause of action that Plaintiff cannot assert because, as discussed above, he is covered by the LHWCA.");[4] Salvato v. Hakko Maritime Corp., 718 F.Supp. 1443, 1444-45 (N.D.Cal. 1989) ("A claim for negligent design is another way of alleging that the ship was not seaworthy at the time of the accident.").

Plaintiff disputes that he is bringing a design defect

---

4  In Anastasiou v. M/T World Trust, 338 F.Supp.2d 406, 418 (E.D.N.Y. 2004), plaintiff stated that he was asserting a claim for negligence in maintaining the ship's ramp on grounds that: "(1) the ramp had no handrails or guardrails; (2) the diamond plate surface of the ramp contained no drain holes for water or snow to drain away to prevent slipping; (3) the ramp became slippery when wet; (4) the ramp contained no non-skid or non-slip surface on top of the diamond plate to ward against the slipperiness of the ramp surface when it became wet; (5) the ramp angle of about 13 degrees was too steep; and (6) the foot grip strips on the ramp did not cover the entire width of the ramp." (internal quotations omitted).  The Court determined that plaintiff was asserting a theory of design defect, not negligence.  Id. at 418-19.

claim.  Instead plaintiff argues that he is bringing a
negligence claim and alleges defendants breached their turnover
duty and active operations duty.

  C. **Turnover Duty**

  The "turnover duty," generally concerns the condition of
the ship when stevedoring operations begin and includes a duty
to warn.  Although the burden for avoiding injuries from obvious
hazards is placed on the stevedore, if the hazard is
unavoidable, or "practically unavoidable", then, depending on
the specific facts, the shipowner may be liable.  See Kirsch v.
Plovidba, 971 F.2d 1026, 1030-31 (3d Cir. 1992); Hill v.
Reederei F. Laeisz G.M.B.H., 435 F.3d 404, 412 (3d Cir. 2006)
(The duty to turn the ship over to the longshoremen in safe
condition includes "... mitigating open and obvious hazards if
the ship reasonably should know that longshoremen either (a) are
likely to work through them rather than mitigating them, or (b)
are unable to mitigate them through practical measures.").

  Plaintiff argues that defendant had actual knowledge that
the ladder was an obvious and unavoidable hazardous condition,
but failed to remedy it or to provide adequate warnings or
instructions to the longshoremen.  In support thereof, plaintiff
relies on the expert report of Arthur W. Faherty, marine
engineer, who opined that the standards for normal fixed

vertical ladders were "breached" and no instructions were
provided to the longshoremen.  Specifically, the report states
that the bottom rung of the ladder breached international
standards for ladder safety by being approximately two and a
half feet above the deck below.  The report also states that the
clearance or space between the vertical ladder and the adjacent
bulkhead was approximately 21 inches - less space than the
normal standard for climbing clearance of 24 to 30 inches – so
that if a person was to stand directly in front of the ladder
and try to put his foot up onto the bottom rung from the deck,
he could not do so because of insufficient space to raise his
foot.  Plaintiff also maintains that the set of two rungs welded
to the bulkhead should be aligned directly across from the fixed
ladder.  Plaintiff argues that defendant provided no written or
verbal instructions or warnings to the longshoremen that using
the rungs was the proper way to get to the bottom of the ladder.

Defendant argues that Faherty's report is flawed for
several reasons,[5] including the fact that the basis of Faherty's

---

5 Defendant also argues that plaintiff's expert report sets
forth impermissible legal conclusions, and that plaintiff's
expert is not a naval architect and therefore cannot provide
opinions on ship design or construction.  The Court need not
address these arguments which amount to an unfiled Daubert
challenge since summary judgment is proper without excluding the
expert report.

16

opinion relies on standards from the American Society of Testing and Materials ("ASTM"), the American National Standards Institute ("ANSI"), and the Occupational Safety and Health Administration ("OSHA"), but that none of these standards apply to an oceangoing cargo ship.  Defendant states that the M/V ANAPA was a Liberian flag vessel classed by the classification society Bureau Veritas.[6]  Defendant states that Faherty's reliance on ANSI and OSHA is misplaced because ANSI and OSHA do

---

6    Defendant states that during and at the completion of their construction, all oceangoing ships must be approved, inspected, and certified by a recognized classification society and by the flag state in order verify that the ship is properly constructed and equipped. (relying on Anastasiou, 338 F. Supp. 2d at 419). Defendant maintains it was entitled to rely on the certifications by classification society Bureau Veritas on behalf of the flag state Liberia to verify compliance with all applicable standards and to confirm that the ship was properly constructed and equipped.  Plaintiff argues that the certificates issued do not cover the ladder.  However, even if the certificates directly pertained to the ladder, such certificates do not establish seaworthiness.  See Anastasiou, 338 F. Supp. 2d at 419 (finding plaintiff did not dispute that the vessel was built according to the surveyors of the American Bureau of Shipping ("ABS"), but that approval from a classification society, such as ABS, does not establish seaworthiness).  We view this issue as a red herring.  Just as plaintiff may not bring a claim for "unseaworthiness", defendants' defense of seaworthiness is irrelevant.  The only proper question in this case is not the ship's design (including the ladder) – another way of saying seaworthiness – but whether the shipowner was negligent in some way other than the ship's design. In this regard, we reject any relevance to Faherty's opinion to the extent it is offered to show the defendant is liable to plaintiff because of the negligent design of the ship.

not apply to ships.[7]  Defendant also argues that Faherty's

opinion as to the bottom rung of the ladder is flawed because it

overlooks the fact that the distance from the deck to the lowest

grey rungs is between 13.38 inches and 14.9 inches.

Plaintiff does not provide any evidence that the standards

relied upon by its expert are applicable to a cargo ship such as

the M/V ANAPA.  On summary judgment, the plaintiff must come

forward with evidence to rebut evidence presented by the

defendant.  See Anderson, 477 U.S. at 256-57 (to withstand a

properly supported motion for summary judgment, the nonmoving

party must identify specific facts and affirmative evidence that

contradict those offered by the moving party).

Even if the standards applied, plaintiff's expert report

states that the "ladder set-up, and location...was very unusual

---

7    Defendant quotes from the ANSI standard attached to the
Faherty report: "This standard is intended for application to
the types of fixed structures depicted and described in the
standard (i.e. buildings, wells, and shafts)." (Pl. Ex. 8 at
page 1 of the "American National Standards for Ladders-Fixed-
Safety Requirements" at §1.5 "Exceptions").  Defendant also
states that the OSHA standard on which Faherty relies, 29 C.F.R.
§1917.118(d)(5), likewise does not apply to ships and states
that the regulation applies "to employment within a marine
terminal as defined in § 1917.2, including the loading,
unloading, movement or other handling of cargo, ship's stores,
or gear within the terminal or into or out of any land carrier,
holding or consolidation area, any other activity within or
associated with the overall operation and function of the
terminal...." 29 C.F.R. §1917.l.

for marine pedestal cranes."  An unusual configuration is not the same as a hazardous configuration.  See U.S. v. Athlone Industries, Inc., 746 F.2d 977, 982 (3d Cir. 1984) (acknowledging definition of a hazardous consumer product as a "consumer product which presents imminent and unreasonable risk of death, serious illness, or severe personal injury.").  Indeed, plaintiff ascended and descended an identical ladder configuration (in Cargo No. 3) before his accident without incident.  His coworkers used the unusual ladder configuration for several shifts without incident.

Moreover, plaintiff has presented no evidence that the ladder was damaged or altered in any way, thus creating a hazardous condition.  See Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 94, 114 S.Ct. 2057 (1994) (hazardous condition created when deck lined with clear plastic caused plaintiff to slip and fall); Davis v. Portline Transportes Maritime Internacional, 16 F.3d 532, 537 (3d Cir. 1994) (hazardous condition created from grease and ice on deck of ship); Williams v. Precious Cliffs, Ltd., No. 04-cv-0746, 2006 WL 2057891, at *4 (E.D.Pa. July 21, 2006) (hazardous condition due to broken railing near ladder leading down into the hatch).

Plaintiff has not rebutted defendant's argument with any evidence that the fixed ladder was a hazardous condition.

19

Accordingly, plaintiff has not presented sufficient evidence that defendant breached its turnover duty.[8]

### D. Active Operations Duty

The active operations duty generally applies to areas that remain under the active control of the vessel.  Although the No. 2 crane was turned over to the control of the stevedore, plaintiff speculates that a vessel worker may have been in Crane No. 2 prior to 1:15 p.m. and from this argues the worker failed to properly align the red ladder with the set of gray rungs.  He states that the bottom rung of the fixed ladder was not properly aligned with any set of gray rungs when he ascended the No. 2 crane, and that the nearest set of gray rungs was too far away for him to use.

Defendant argues that the ladder did not need to be aligned with a particular set of rungs.  Defendant states that the six sets of rungs are spaced around the housing so that no matter where the ladder was positioned a set of gray rungs was only inches away.  Defendant presented evidence that if the ladder

---

8  Even if the ladder were found to be a hazardous condition, plaintiff has not provided evidence that could show that the longshoremen were "unable to mitigate [the hazard] through practical measures" since plaintiff's coworkers used the ladders throughout their shifts, and plaintiff went up and down Crane No. 3, with the same configuration as Crane No. 2, earlier in the day.

was positioned between two sets of grey rungs, which is the farthest away it could be from a set of rungs, the ladder was only 9.45 inches away.  Therefore, at any given time, the ladder was 9.45 inches, or less, away from a set of gray rungs.

Plaintiff has not rebutted defendant's evidence by showing that he was unable to stand on the nearest set of rungs and reach the ladder.  He has not presented any evidence that nearest set of rungs were inaccessible, or that the ladder needed to be aligned in a particular location.  Indeed, given the uncontested fact that the gray rungs were always within a few inches of the ladder no matter where the crane was left after its last operation, the only reasonable conclusion a juror could reach was that plaintiff chose to ignore the rungs and attempted to climb the ladder without them.  Accordingly, plaintiff has not presented sufficient evidence that defendant breached its active operations duty.

### V. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment will be granted.

An appropriate Order follows.

Dated:   February 20, 2015          s/Noel L. Hillman
                                     NOEL L. HILLMAN, U.S.D.J.
At Camden, New Jersey

21